**MOUNTAIN STATES LEGAL
FOUNDATION, et al.,
Appellants,**

v.

**Dan GLICKMAN, Secretary
of Agriculture, et al.,
Appellees.**

No. 95–5185.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 18, 1996.

Decided August 23, 1996.

Todd S. Welch, Denver, CO, argued the cause for appellants. William P. Pendley was on the briefs with him.

Edward J. Shawaker, Attorney, United States Department of Justice, Washington, DC, argued the cause for appellees. Lois J. Schiffer, Assistant Attorney General, Anne S. Almy and Robert L. Klarquist, Attorneys, were on the brief with him.

Douglas L. Honnold and James S. Angell, Oakland, CA, were on the brief for appellees the Wilderness Society, et al.

Before: BUCKLEY, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Plaintiffs—two non-profit corporations, several Montana and Idaho municipalities, and a lumber company—filed suit attacking the government's choice among several alternatives for timber harvesting in part of a national forest. They claimed that in rejecting alternatives with more harvesting the government disregarded necessary procedures and neglected (or at least gave too short shrift to) important factors, i.e., acted arbitrarily and capriciously. The plaintiffs based their claims on federal statutes governing use of the national forests, as well as on the Administrative Procedure Act, NEPA (the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.) and the ESA (Endangered Species Act, 16 U.S.C. §§ 1531 et seq.). The district court dismissed most claims on the pleadings for want of standing, and the rest on summary judgment for want of standing and, in the alternative, on the merits. See *Mountain States Legal Foundation v. Madigan*, Civ. A. No.92–0097, 1992 WL 613292 (D.D.C.1992); *Mountain States Legal Foundation v. Glickman*, 922 F.Supp. 628 (D.D.C.1995). We affirm, though for the most part on the merits rather than on standing.

\* \* \*

In 1972 the Forest Service discovered that the mountain pine beetle was infesting and killing a number of lodgepole pine stands in the Upper Yaak River drainage region of the Kootenai National Forest in Montana. Since dead trees rapidly lose their commercial value and contribute to wildfire risk, the Forest Service sought to accelerate timber harvesting in the region and began construction and reconstruction of logging roads. The Ninth Circuit found that the different road building and logging operations going on in the Upper Yaak were "connected actions" for purposes of NEPA, and thus were of enough significance to require an Environmental Impact Statement. It enjoined further operations pending completion of the statement. See *Save the Yaak Committee v. Block*, 840 F.2d 714 (9th Cir.1988).

The required EIS, finished in 1990, discussed the environmental, social, and economic effects of 14 alternate plans with varying levels of timber harvest and road construction. See United States Forest Service, *Upper Yaak Final Environmental Impact Statement* (April 20, 1990) ("FEIS"). The FEIS preferred "Alternative 9B," which was among the choices allowing the least logging. But the Forest Supervisor for the Kootenai National Forest picked Alternative 9A, which allowed considerably more logging, on the grounds that it would "provide the highest timber harvest level while meeting the requirements of the ESA." Record of Decision at 2 (August 24, 1990).

Plaintiffs filed suit in district court after the Regional Forester upheld the Supervisor's selection. They would have the Forest Service allow more logging, specifically championing Alternative 6, which projects sales of 151 million board feet ("MMBF") of lumber, compared to Alternative 9A's 90 MMBF. Besides the Administrative Procedure Act, the ESA and NEPA, they invoke three statutes guiding the administration of the national forests: the Organic Act, 16 U.S.C. §§ 473–82, 551, the Multiple–Use Sustained–Yield Act ("MUSYA"), 16 U.S.C. §§ 528 et seq., and the Resources Planning Act as amended by the National Forest Man-

agement Act ("NFMA"), 16 U.S.C. §§ 1600 et seq.

Although several of plaintiffs' claims are procedural, their significance depends on the plaintiffs' substantive theories. These appear to be twofold. First, plaintiffs believe that the selection of Alternative 9A makes an arbitrary trade-off as between the welfare of the grizzly bear and its habitat as opposed to the welfare of people who make a living through the timber industry, unduly favoring the grizzly. Second, they say that the timber left in place under Alternative 9A poses an unnecessarily high risk of catastrophic wildfire, endangering the grizzly bear, the forest itself, and people living nearby. Before we discuss the merits of the claims, we first examine plaintiffs' standing to bring them.

## I. Standing

■ Plaintiffs must establish both constitutional and prudential standing. Because they assert quite a variety of injuries, we think it worthwhile to make the point—perhaps obvious, but on which we've found no cases—that on any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite "zone of interests" for purposes of prudential standing. For example, if plaintiffs established an interest sufficiently aligned with the purposes of the ESA for prudential standing, but failed to show (for example) an adequate causal relation between the agency decision attacked and any injury to that interest, we could not adjudicate the claim—even if plaintiffs had constitutional standing with respect to some other interest that was outside the requisite "zone." With this in mind, we first examine whether plaintiffs allege injuries adequate for constitutional standing, and then inquire whether at least one of those injuries can be tied to interests protected by each statute at issue.

■ For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim. See *Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); *Village of Arlington Heights v. Metropolitan Housing De-*

*velopment Corp.*, 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977).

### A. Constitutional standing

■ The "irreducible constitutional minimum" of standing contains three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... traceable to the challenged action of the defendant.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal quotations and citations omitted). See also *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982). We find that the plaintiffs have set forth facts showing those elements in two independent ways, each in enough (unrebutted) detail to withstand a motion for summary judgment.

#### 1. Injury to economic interests from curtailment of logging

■ Plaintiff Owens & Hurst Lumber Company is located in Eureka, Montana, and is "almost totally dependent on federal timber for its raw materials, about one third of which comes from the upper Yaak River drainage." First Amended Complaint ¶ 12 at 5–6. The owner of the company averred that after the Forest Service's announced plans to allow logging of 300 MMBF of lumber from the Yaak Area were postponed by "appeals" (presumably the litigation resulting in *Save the Yaak Committee*'s injunction), the company's mill was temporarily closed and twenty-five workers were laid off. Declaration of James L. Hurst ¶ 4 at 2. Given the company's historic dependence upon the Upper Yaak for its supply, together with the disrup-

tive effect of the past shutdown, logging cutbacks in the Upper Yaak clearly inflict injury on the firm's economic well-being, which an order reducing the cutbacks would redress. And even forcing the Forest Service to rethink the issue would have some chance of affecting the cutbacks. See *Defenders of Wildlife,* 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7 (for procedural default, plaintiffs need not show that the default necessarily caused the injury or that its correction would necessarily redress the injury).

The district court, after reciting *Lujan's* standard for constitutional standing, rejected any economic injuries as the basis for "injury in fact" because "the Organic Act, MUSYA, and NFMA do not provide a legally cognizable economic interest in a specified level of timber harvest." *Mountain States Legal Foundation v. Glickman,* 922 F.Supp. 628, 631–32 (D.D.C.1995), citing *Region 8 Forest Serv. Timber Purchasers v. Alcock,* 993 F.2d 800, 808 (11th Cir.1993) (denying plaintiffs' "right" to future timber but seeming to rest denial of standing primarily on speculative relation between decision attacked and any future curtailment of supply).

We take it that the district court's phrase "legally cognizable" draws upon the *Lujan* Court's uses of similar phrases to modify the necessary "injury," e.g., "legally protected," 504 U.S. at 560, 112 S.Ct. at 2136, and "cognizable," *id.* at 562–63, 112 S.Ct. at 2137. While we are unsure what function the Court intended for these modifiers, we are quite confident it did not intend to restore the "legal right" test. However one times that test's demise, it clearly did not survive *Association of Data Processing Serv. Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970), which held that the "legal interest" test went to the merits and not to standing, and found sufficient injury in the loss of profits that plaintiffs claimed would flow from the defendant's unduly permissive regulation of competitors. Compare, e.g., *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 125, 60 S.Ct. 869, 875–76, 84 L.Ed. 1108 (1940) (plaintiff must show injury to a right). The plaintiffs may not have any particular right to federal timber contracts, but no such "right" is required any more

than a "right" to view crocodiles in foreign sites was necessary for the plaintiffs in *Lujan.* There the Court acknowledged that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing," *Lujan,* 504 U.S. at 562–63, 112 S.Ct. at 2137, and proceeded to reach the question of whether the plaintiffs' vague plans to return to their allegedly-threatened overseas animal watching were sufficient to make the possible injury to that interest "actual or imminent." *Id.* at 564, 112 S.Ct. at 2138. Government acts constricting a firm's supply of its main raw material clearly inflict the constitutionally necessary injury.

The district court, believing the selection of Alternative 6 would run afoul of the Endangered Species Act, found that any injuries to plaintiffs from the selection of Alternative 9A were irredressable. *Mountain States v. Glickman,* 922 F.Supp. at 633. In fact there is some confusion in the cases on whether legal limits on redress are part of the calculation of redressability for standing purposes. The Supreme Court has assumed that they were, saying in *Franklin v. Massachusetts,* 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), that the courts' lack of power to enjoin the President was not a bar to standing because an order against the Secretary of Commerce *would* afford relief. *Id.* at 802–03, 112 S.Ct. at 2776–77. And in *North Carolina Utilities Comm'n v. FERC,* 653 F.2d 655, 667–68 (D.C.Cir.1981), we held that plaintiffs' claim that an agency had unlawfully ended an investigation was irredressable because of the agency's discretion to refuse to adopt any remedies regardless of the investigation's outcome. Cf. *Kennecott Utah Copper v. Dep't of Interior,* 88 F.3d 1191, 1202–03 (D.C.Cir.1996) (FOIA claim dismissed for want of jurisdiction where statute barred court from ordering Federal Register publication of documents requested by plaintiffs). But cf. *Defenders of Wildlife,* 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7. In *In re Thornburgh,* 869 F.2d 1503 (D.C.Cir.1989), however, we unequivocally declared that the redressability inquiry was simply whether, if plaintiffs secured the relief they sought, it would redress their injury. *Id.* at 1511.

We need not resolve this conflict here. So far as appears no court in the modern era has treated a garden-variety substantive defect in plaintiffs' claim as defeating redressability. Unlike the situation in *Franklin, North Carolina Utilities Comm'n,* and *Kennecott Utah,* the alleged impediment to redress stems not from a defect in the court's institutional power to order a specific remedy but merely from the interplay of various statutes bearing on the substantive validity of the Forest Service decision. Assuming that purely legal remedial gaps can establish a lack of redressability, the substantive impact of the ESA is not a remedial gap at all; to treat it as an impairment of redressability would seemingly allow any merits defect in plaintiffs' claim to defeat their standing. Accordingly the ESA's substantive provisions are irrelevant on this point.

### 2. Damage to aesthetic and environmental interests from increased risk of wildfire

Plaintiffs assert that their members use the Kootenai National Forest in ways that would be severely impaired if government error led to a devastating wildfire. Bruce Vincent, for instance, a member of plaintiff Communities for a Great Northwest, said he was a resident of Libby, Montana, located in the middle of the Kootenai National Forest, and that he uses the forest for, inter alia, hiking, hunting, camping, fishing, observing wildlife, finding solitude, and picking berries. Declaration of Bruce Vincent ¶¶ 1–3 at 1–2. See also Declaration of John Hossack ¶¶ 1–3 at 1–2 (describing activities such as camping and hiking in area of Kootenai that is part of Upper Yaak). Plaintiffs' aesthetic and environmental interests in having such areas free of devastating forest fire are clearly sufficient for Article III standing. See *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1365–66, 31 L.Ed.2d 636 (1972); *Humane Society of the United States v. Babbitt,* 46 F.3d 93, 97 (D.C.Cir.1995).

Of course plaintiffs must show that the acts under review posed a threat to these interests. In fact they point to affidavits that they have submitted, along with the FEIS itself, to claim that the selection of Alternative 9A creates an increased risk of catastrophic wildfire compared to other alternatives (such as Alternative 6). In a section on fires and fuel management, the FEIS allows that dead trees within lodgepole pine stands infested with the mountain pine beetle provide "a tremendous accumulation of fuels in a short period of time.... Timber harvesting and post sale fuel treatment would greatly reduce the wildfire risk in these high risk stands." FEIS at IV–148. See also *id.* at III–40 (describing rapid buildup of fuel from dying pine and noting that lightning, rather than human activity, has caused the most wildfires). Indeed, a table comparing the respective effects of each proposed alternative singles out each alternative's percent reduction in "fuel loading"—i.e., trees, dead and alive—as the gauge of its impact on wildfire risk. *Id.* Table II–3 at II–48. It projects a 5.4% reduction in high-risk fuels acres for alternative 9A, but a 14.2% reduction for Alternative 6, thanks to the greater logging under the latter.

The district court was unimpressed by the difference, branding a claim of increased wildfire risk as "mere speculation." *Mountain States Legal Foundation,* 922 F.Supp. at 632. Of course for a probabilistic event such as a wildfire, almost any act (other than, say, deliberate setting of a fire) merely affects probabilities, but we do not understand the customary rejection of "speculative" causal links, see, e.g., *Lujan,* 504 U.S. at 567, 112 S.Ct. at 2140 (finding too speculative idea that single project affecting some portion of a species will thwart would-be observer's goals), as ruling out all probabilistic injuries. The more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing. In *Village of Elk Grove Village v. Evans,* 997 F.2d 328 (7th Cir.1993), for example, plaintiffs were concerned that construction of a radio tower on a flood plain, "by plopping down a huge slab of concrete near the creek and thus limiting the creek's drainage area," would increase the risk of flooding. *Id.* at 329. The court acknowledged that the injury was probabilistic, but reasoned that "even a small probability of injury is sufficient to create a case or controversy—

to take a suit out of the category of the hypothetical—provided of course that the relief sought would, if granted, reduce the probability." *Id.* And in *Dimarzo v. Cahill,* 575 F.2d 15, 18 (1st Cir.1978), the court found enhanced risk of fire an adequate injury, not even mentioning the issue of risk quantification. While there the plaintiffs—inmates in an allegedly fire-prone jail—were much more directly at risk, the opinion reflects, we think, a sensible recognition that the potential destruction of fire is so severe that relatively modest increments in risk should qualify for standing.

Under the figures presented here, the Forest Service's choice was between keeping 85.8% of the fuel and keeping 94.6%. Thus, although residual fuel is the main wildfire variable at stake in the decision under review, the difference between plaintiffs' and the Forest Service's choices is proportionally small—Alternative 9A *retains* only about 10% more fuel than Alternative 6. (On the other hand, Alternative 6 *removes* about three times as much fuel as Alternative 9A.) Presumably the high retention rate under both alternatives was acceptable because the Forest Service viewed the expected negative value of wildfires (i.e., an aggregation of the damage from fires of all possible scales, each type weighted by its probability) as tolerably low. Yet when an agency has devoted a large portion of its decisionmaking resources to comparing alternatives' different effects on wildfire, and pointed to non-trivial variations in risk, it would take some rather dramatic piece of information to persuade us that the difference is so trivial that persons physically close to the potential fire cannot question the decision.

In finding the effect of different fuel levels merely speculative, the district court pointed to the presence of other variables affecting wildfire risk, saying that "the risk of wildfire is primarily controlled through restrictions on harvest activities, and control of public access to areas with accumulating fuels that feed the fire." *Mountain States Legal Foundation,* 922 F.Supp. at 632. But the cited passage of the FEIS clearly listed "fuels" as the first source of risk, and said (logically enough) that that risk was "con-

trolled *primarily* through the management of fuels that could feed the fire," i.e., the primary control device was the obverse of the apparently primary cause. FEIS III–40 (emphasis added). Accordingly, though the presence of other causal factors is indisputable, we think that under *Village of Elk Grove Village* and *Dimarzo* the incremental risk is enough of a threat of injury to entitle plaintiffs to be heard.

Of course, the plaintiffs must demonstrate that *they* would be injured by any wildfire that might result from the risk differential. The Hossack affidavit states not only that Hossack hikes and camps in the Kootenai, but also that the part of the Kootenai next to his home town (Eureka) is in fact the Upper Yaak Drainage Area, the entirety of which is to be governed by the logging decisions under review. Thus we understand him (and defendants do not suggest the contrary) to be asserting that his hiking and camping occur in precisely the area affected by the wildfire risk. Accordingly, plaintiffs do not suffer the defect of those in *Lujan v. Nat'l Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990), who stated only that one of their members used "unspecified portions of an immense tract of territory" in which some localized mining might occur.

### B. Prudential standing

Plaintiffs cannot sue to prevent violations of statutes causing them harm unless they fall within the "zone of interests" the statutes were passed to protect. See, e.g, *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. at 153, 90 S.Ct. at 829–30; *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 394–403, 107 S.Ct. 750, 754–59, 93 L.Ed.2d 757 (1987); *Lujan v. Nat'l Wildlife Federation,* 497 U.S. at 883, 110 S.Ct. at 3186. We thus turn to each of the statutes invoked to see if either of plaintiffs' injuries which qualify for constitutional standing are injuries to interests protected by those statutes, so that they are "aggrieved by agency action" within the meaning of the APA, 5 U.S.C. § 702.

### 1. National Environmental Policy Act

Despite NEPA's rather sweeping list of interests intended to be served, see 42

U.S.C. §§ 4321, 4331, we have said that they do not include purely monetary interests, such as the competitive effect that a construction project might have on plaintiff's commercial enterprise. *Realty Income Trust v. Eckerd,* 564 F.2d 447, 452 (D.C.Cir. 1977). But a plaintiff's economic interests do not blight his qualifying ones, such as aesthetic and environmental interests in the quality of public lands where he hikes, camps, fishes, etc. Under our circuit's law NEPA standing is not limited to the "pure of heart." *Realty Income Trust,* 564 F.2d at 452–53. Accordingly, plaintiffs whose members use the Upper Yaak for such purposes as hiking are plainly within the zone of interests protected by NEPA, and, as we have seen, the enhanced wildfire risk is a constitutionally adequate injury to that interest. So we need not consider whether plaintiffs would have NEPA standing to attack the defendants' decision on the ground that its increase in wildfire risk (which is surely "environmental") impinges on their logging interests.

## 2. The forest management statutes

■ All of these statutes make clear a congressional intention that the national forests should play a significant role in supplying timber, an interest that firms engaged in logging and relying on the national forest as their primary source seem well suited to advance. They also, especially the later statutes, indicate a purpose to advance outdoor recreation; individuals who hike, camp and fish in the forest are thus intended beneficiaries, and the plaintiff foundations to which they belong are suitable champions. *Hazardous Waste Treatment Council v. EPA,* 861 F.2d 277, 283 (D.C.Cir.1988). See also First Amended Complaint ¶ 4 at 2–3 (alleging that Mountain States Legal Foundation is "dedicated to making the public lands available for multiple use as provided by federal law"); *Lujan v. Nat'l Wildlife Feder-*

*ation,* 497 U.S. at 885, 110 S.Ct. at 3187, citing *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Specifically, the Organic Act provides that "[n]o national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States[.]" 16 U.S.C. § 475. The Multiple–Use Sustained–Yield Act declares the policy of the Congress "that the national forests ... shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. And NFMA similarly says that the national forests should provide for yield of the products and services mentioned by the MUSYA, specifically including timber, recreation, and watershed. 16 U.S.C. § 1604(e).

## 3. The Endangered Species Act

■ The plaintiffs make two distinct claims under the ESA, ones that are at least superficially at odds with each other.[1] First, they argue that the heightened risk of wildfires resulting from the government's choice of Alternative 9A will threaten the grizzly bear and its habitat along with the rest of the forest. Protecting the grizzly bear (listed as threatened, see 50 C.F.R. § 17.11) is certainly within any zone of interests contemplated by the ESA, but is not among the interests explicitly advanced by plaintiffs in their successive complaints and affidavits. The closest they have come to asserting a concrete interest in the grizzly are expressions of members' desires to observe wildlife generally. In the absence of any reference to past (and anticipated future) enjoyment of the grizzly bear's presence, a mere expression of enjoyment of all things sylvan is inadequate to show a " 'directly' affected" interest with

---

1. Plaintiffs do not assert that the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1), dispenses with any requirement of prudential standing at all, i.e., manifests a congressional intent to allow suits up to the limit of constitutional standing. There is a circuit split on the issue. See *Bennett v. Plenert,* 63 F.3d 915, 918 n. 3 (9th Cir.1995), cert. granted, —— U.S. ——, 116 S.Ct. 1316, 134 L.Ed.2d 469 (1996). Our own circuit has ap-

plied the zone of interests test without discussion of the citizen suit provision. See *State of Idaho v. Interstate Commerce Comm'n,* 35 F.3d 585, 592 (D.C.Cir.1994); *Humane Society of the United States v. Hodel,* 840 F.2d 45, 60–61 (D.C.Cir. 1988). Since the plaintiffs do not mention the citizen suit provision, or answer the government's claim that they failed to invoke it, we do not address the issue.

adequate specificity to survive dismissal on the pleadings, much less summary judgment. See *Lujan v. Defenders of Wildlife*, 504 U.S. at 562–63, 112 S.Ct. at 2137–38, quoting *Sierra Club v. Morton*, 405 U.S. at 735, 739, 92 S.Ct. at 1366, 1368. Indeed, at one point below the plaintiffs asserted that there was "no evidence that grizzly bear habitat exists in the Decision Area." Plaintiffs' Motion for Summary Judgment at 28 (June 24, 1994). Plaintiffs cannot claim an injury to their grizzly-viewing interests if they do not think there are grizzlies in the area to begin with. "If you've got nothing, you've got nothing to lose." B. Dylan, "Like a Rolling Stone," Highway 61 Revisited (Columbia Records 1965).

 The plaintiffs' second claim is explicitly economic. They point out that a designation of critical habitat under the ESA, and application of its concomitant protections, is to occur only after a consideration of the designation's economic effect:

> The Secretary shall designate critical habitat ... on the basis of the best scientific data available and after taking into consideration the *economic impact*, and any other relevant impact, of specifying any particular area as critical habitat.

16 U.S.C. § 1533(b)(2) (emphasis added). The plaintiffs claim that the authors of the FEIS and the Record of Decision *implicitly* designated the Upper Yaak as critical habitat for the grizzly bear, but without performing the economic analysis required by § 1533(b)(2).

While Congress clearly did not adopt the ESA for the purpose of protecting economic interests, it equally clearly intended that such interests should come into play when critical habitats are designated. The canonical statement of the zone of interests test—that it embraces those whose interests are *"protected* or *regulated* by the statute ... in question," *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970) (emphasis added)—seems to presuppose a divide between the interests of the "protected" and of the "regulated." In the context of private sector regulation (the context of *Data Processing* itself, for example),

the divide commonly exists and presents no obstacle to sound analysis. The "protected" parties advance the interests that initially spurred legislative intervention, and the "regulated" ones advance the interests of those who might be burdened by the agency's going too far in pursuing the statute's primary thrust.

> [N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.

*Rodriguez v. United States,* 480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987). But where the statute governs the use of public property, and thus the "regulated" entity and the decisionmaking agency are one and the same, denial of standing to private parties adversely affected by excessive agency zeal would leave the countervailing values with no conceivable champion in the courts. We see no reason to suppose that Congress would have intended so drastic a tilt. As plaintiffs have shown an eminently plausible relationship between their interests and policy values that play an important constraining role in the statutes at issue, and thus must be said to underlie those statutes, see *Humane Society of the United States v. Hodel,* 840 F.2d 45, 60–61 (D.C.Cir.1988); *Clarke v. Securities Indus. Ass'n,* 479 U.S. at 403, 107 S.Ct. at 759, we see no obstacle to prudential standing.

We thus part company with the Ninth Circuit, which has held economic interests to be fundamentally at odds with the statutory purpose of the ESA, and any vindication of them to be a frustration of that purpose. See *Bennett v. Plenert,* 63 F.3d 915, 921–22 (9th Cir.1995), cert. granted, —— U.S. ——, 116 S.Ct. 1316, 134 L.Ed.2d 469 (1996). While ordinarily we would be most reluctant to create a circuit split, in this case the usual reasons for hesitation are absent: thanks to the Supreme Court's having already granted certiorari in *Bennett,* any error we make will

be corrected not only swiftly but cheaply— with no additional burden on the Court.

## II. The Merits

### A. The forest management statutes

■ Timber harvesting is clearly a major goal of the forest management statutes, as we noted in our discussion of their various zones of interests. But this does not mean that logging must be maximized at the expense of all other values. "Multiple use" does "not necessarily [mean] the combination of uses that will give the greatest dollar return or the greatest unit output." 16 U.S.C. § 531. Moreover, the Forest Supervisor made it clear that he selected Alternative 9A because it maximized logging subject to the constraint of meeting various other criteria, including issues relating to water supply and the welfare of the grizzly. Record of Decision at 1–2 (August 24, 1990). Specifically, Alternative 9A offered the most logging for any alternative that satisfied the requirement—which the Forest Supervisor treated as an absolute—of supplying the "70% effectiveness level" for grizzly habitat—as against a 69% effectiveness for Alternative 6. See id.; FEIS Table S–2 at S–11.

Plaintiffs urge that increased logging is not at odds with the statutes' other values, since the dead and dying lodgepole pines left behind under Alternative 9A contribute so powerfully to wildfire risk and thereby endanger the entire forest. Certainly an attention to 1% variances among the alternatives of "habitat effectiveness" for the grizzly could be myopic if those same alternatives provided wildly varying levels of catastrophic wildfire risk.

There are two crucial drawbacks to plaintiffs' position, however. The first is that the gap which appeared non-fatal as to standing—that they had not translated the difference in fuel removal levels between Alternatives 6 and 9A into differences in wildfire probability (with suitable weighting for seriousness)—is here a graver defect. Without some quantification of the incremental wildfire risk, we are in no position to say that the defendants—who carefully gathered virtually all the data on which plaintiffs rely—acted arbitrarily or capriciously. Second, the 70% effectiveness requirement derives from an interpretation of the ESA that—as we shall see—plaintiffs do not successfully contest. There is nothing arbitrary or capricious about an officer's incurring some incremental wildfire risk if the law requires him to do so.

Plaintiffs' claims about an invalid water yield model are not mentioned on appeal and are apparently abandoned.

### B. The Endangered Species Act

We have found that plaintiffs lack standing for their claim based on wildfire's threat to the grizzly, and thus are left with the claim that the Forest Service designated an illegal de facto critical habitat without the required consideration of countervailing economic concerns.

■ Here plaintiffs' critical premise is that the welfare of a threatened or endangered species is of no special interest to federal land managers except on lands designated as critical habitat. That is not the law. The ESA provides that

> [e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to [1] jeopardize the continued existence of any endangered species or threatened species or [2] result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical . . .

16 U.S.C. § 1536(a)(2). The ESA thus appears, in the part we have designated [1], to bar actions jeopardizing the continued existence of a threatened or endangered species, regardless of whether any habitat has been marked as critical. Indeed, plaintiffs offer no legal analysis to the contrary. Here, the Forest Supervisor consulted with the Fish and Wildlife Service about the impact of Alternatives 6 and 9A on the grizzly as required by Section 7 of the Endangered Species Act, see Record of Decision at 2, and the Fish and Wildlife Service concluded that "timber harvesting as outlined under Alternative 6 is likely to jeopardize the continued existence of the grizzly bear, and that timber

harvesting under Alternative 9A is not likely to jeopardize the grizzly bear." Biological Opinion at 1 (June 20, 1990). This did not depend on a critical habitat designation, and plaintiffs say nothing to draw in question the merits of the jeopardy assessment, which listed six factors creating a "jeopardy situation" for the grizzly bear and seven ways in which Alternative 6 fails to redress the situation. Biological Opinion at 6–9. Accordingly, we affirm the district court's dismissal of the claim as a matter of law.

### C. National Environmental Policy Act

■ Here plaintiffs' essential claims appear to be that the government failed to prepare environmental impact statements for a grizzly bear recovery plan and for a Memorandum of Understanding with Montana regarding water issues.

As to the first claim, the objection rests on a rather long chain of decisionmaking, one link of which, say plaintiffs, required but did not receive the benefits of an environmental impact statement. Recall that of the alternatives reviewed, the Forest Supervisor selected Alternative 9A because it would "provide the highest timber harvest level while meeting the requirements of the ESA," Record of Decision at 2, i.e., would not jeopardize the recovery of the grizzly. He relied on the Fish & Wildlife Service's Biological Opinion, which ruled out Alternative 6 because it did not satisfy various criteria said to be necessary "to avoid the likelihood of jeopardizing the grizzly bear." Biological Opinion at 7. Plaintiffs do not contest that finding substantively, nor do they claim that the Biological Opinion itself required an EIS. Rather, they appear to claim that the defect lies in a still earlier step, the formulation of what they call a "Grizzly Bear Recovery Plan." Appellants' Opening Brief at 50; Complaint ¶¶ 111–120 at 37–39; First Amended Complaint ¶¶ 67–70 at 18–19. But plaintiffs have neither identified this alleged plan, nor shown what role it may have played in the framing of the Biological Opinion or any other agency decision. Accordingly, we have no basis for saying that creation of the "Plan," if indeed it ever was created, required the preparation of an EIS.

As to the plaintiffs' claim about an illegal Memorandum of Understanding on water quality, it depends on their assertion that the government used "water quality as the only real factor to select Alternative 9A." First Amended Complaint ¶ 66 at 18. This is plainly false. It is clear that concern for the grizzly bear, and a desire to follow the ESA, led the Forest Supervisor to narrow the set of alternatives from which he chose.

\* \* \*

The district court's judgments, though in part erroneous with respect to standing, must be upheld because the claims for which plaintiffs have standing lose on the merits. For the foregoing reasons, the judgments of the district court are

*Affirmed.*