**COMMUNITIES FOR A GREAT NORTHWEST, LTD., et al., Plaintiffs,**

**v.**

**William Jefferson CLINTON, President of the United States, et al., Defendants.**

**No. CIV. A. 98–2027(ESH).**

United States District Court, District of Columbia.

Aug. 23, 2000.

---

William P. Pendley, Mountain States Legal Foundation, Denver, CO, for Plaintiff.

Edward A. Boling, U.S. Department of Justice, Environmental Division, Washington, DC, for Defendants.

### *MEMORANDUM OPINION*

HUVELLE, District Judge.

Plaintiffs Communities for a Great Northwest (CGNW), Oregon Cattlemen's Association (OCA), Montana Farm Bureau Federation (MFBF), and Washington Cattlemen's Association (WCA) ask the Court to declare unlawful the Interior Columbia Basin Ecosystem Management Project (ICBEMP), a plan developed by the U.S. Forest Service and the Bureau of Land Management to manage federal lands in the Interior Columbia River Basin using an ecosystem-based management strategy, on the grounds that the project violates the Property Clause of the Constitution[1], the Regulatory Flexibility Act (RFA)[2], the Federal Land Policy and Management Act (FLPMA)[3], the Multiple–Use Sustained–Yield Act (MUSYA)[4], the National Forest Management Act (NFMA)[5], the Organic Administration Act (OAA)[6], and the Small Business Regulatory Enforcement Fairness Act (SBREFA)[7]. Plaintiffs seek to enjoin the completion of a final environmental impact statement (EIS) and Record of Decision for the IC-BEMP. Defendants President Clinton, the U.S. Department of the Interior, the U.S. Department of Agriculture, the U.S. Forest Service, the Bureau of Land Management, and the heads of those agencies move to dismiss the case for lack of standing, or in the alternative, lack of jurisdiction.

### BACKGROUND

In 1993, in response to a directive from President Clinton, the U.S. Forest Service and the Bureau of Land Management began work on the ICBEMP, the goal of which is to develop an ecosystem-based management strategy for approximately 75 million acres of federal lands in the Columbia River Basin.[8] The agencies designated two teams to develop environmental impact statements for the region, one to consider management of National Forest System lands east of the Cascade Mountains in Oregon and Washington (Eastside), and the other to address management of rangelands in the Upper Columbia River Basin (Upper Columbia River Basin).

The teams from the Forest Service and the Bureau of Land Management each published a draft EIS in June 1997. Each Draft EIS evaluated seven land management alternatives, and each selected alternative # 4, an integrated ecosystem management approach, as the pre-

1. U.S. Const. art. IV, § 3, cl. 2.

2. 5 U.S.C. §§ 601–12 (1994) (amended 1997).

3. 43 U.S.C. §§ 1701 *et seq.* (1997).

4. 16 U.S.C. §§ 528–531 (1998).

5. 16 U.S.C. § 1600 *et seq.* (1998).

6. 16 U.S.C. § 475 (1998).

7. 5 U.S.C. §§ 801 *et seq.* (1996).

8. The Columbia River Basin encompasses lands in Oregon, Washington, Idaho, Utah, Nevada, Montana, and Wyoming.

ferred alternative. The period for public comment on the Draft EISs was extended four times and finally closed on May 6, 1998. The final extension allowed consideration of a congressionally-ordered analysis of the social and economic conditions of the communities covered by the ICBEMP. (The ICBEMP includes 69 million acres of state and private lands, containing 100 counties and 476 cities, towns and villages.) In February 1998 the Forest Service and Bureau of Land Management published an additional economic report that assessed the impacts on those communities from the various management alternatives considered in the Eastside and Upper Columbia River Basin Draft EISs.

In response to comments received during the public comment period, the agencies published a Supplemental Draft EIS in March 2000. The Supplemental Draft EIS supplements the Eastside and Upper Columbia River Basin Draft EISs published in 1997, but it is intended as a stand-alone document. The Supplemental Draft EIS outlines three management alternatives, with "S2" identified as the preferred alternative. The supplement excludes approximately twelve million acres of agency-administered land from ICBEMP coverage that were included in the earlier Draft EISs. Both parties agree, however, that the publication of the supplement does not change the posture of this case. The public comment period on the Supplemental Draft EIS ended on July 6, 2000. To date, no final EIS or Record of Decision has been released.

Plaintiffs filed suit on August 21, 1998, alleging that defendants violated constitutional and statutory land management provisions by engaging in the ICBEMP planning process. Plaintiffs contend that President Clinton "usurp[ed] Congressional legislative authority" by directing the Forest Service and the Bureau of Land Management to develop a new plan for forest management in the Pacific Northwest and thereby violated the Property Clause of the Constitution, which dele-

gates to Congress the power to regulate and dispose of federal property. Plaintiffs further allege that defendants violated the RFA by failing to prepare an adequate initial regulatory flexibility analysis describing the impact of the proposed rule on small businesses, non-profit enterprises, local governments, and other entities. Plaintiffs also claim violations of the FLPMA, the MUSYA, the NFMA, and the OAA for proposing to replace a multiple-use approach to land management with an ecosystem-based management strategy. Finally, plaintiffs contend that the ICBEMP qualifies as a "rule" promulgated by defendants in violation of the SBREFA, which provides that agencies must submit the rules that they promulgate for congressional review before those rules can take effect.

Defendants have filed a Rule 12(b)(1) motion to dismiss on the grounds that plaintiffs have not stated the requisite elements to establish constitutional standing, or alternatively, that plaintiffs have cited no basis for this Court to exercise jurisdiction, since the federal land management statutes do not include provisions for judicial review, and review under the APA and the RFA is precluded because the ICBEMP is not a "final agency action." In response to the motion to dismiss, plaintiffs have supplemented the record with a declaration and other materials to support their claim of standing. The Court has relied on the pleadings as well as the additional materials filed by the plaintiffs in reaching its decision. *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C.Cir.1987) (describing the proper procedure on a 12(b)(1) motion to dismiss for lack of standing: "In 12(b)(1) proceedings, it has been long accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to entertain the case.'") (citations omitted).

## ANALYSIS

### I. *Standing*

■ Plaintiffs must establish both constitutional and prudential standing in

order to seek federal judicial review. *See Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228, 1232 (D.C.Cir. 1996). Article III constitutional standing limits judicial intervention to genuine disputes between adverse parties which are " 'in a form ... capable of judicial resolution,' " *Florida Audubon Society v. Bentsen*, 94 F.3d 658, 663 (D.C.Cir.1996) (quoting *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)), and therefore, it " 'is an essential and unchanging' predicate to any exercise of [federal] jurisdiction." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).[9] Standing must be proven with respect to each claim. *See Warth v. Seldin*, 422 U.S. at 500, 95 S.Ct. 2197 ("Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, ... it often turns on the nature and source of the claim asserted."). However, if one plaintiff can satisfy the standing requirements, a court need not consider the standing of other plaintiffs to hear the claim. *See Mountain States*, 92 F.3d at 1232. In this case, the Court finds that none of the plaintiffs has established constitutional standing with respect to any claim, and thus it is unnecessary to address prudential standing. *See id.* ("[W]e first examine whether plaintiffs allege injuries adequate for constitutional standing, and then inquire whether at least one of those injuries can be tied to interests protected by each statute at issue.").

To meet the constitutional requirements for standing, a plaintiff bears the burden of showing the following: (1) he has suffered an injury which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there is a causal connection between the alleged injury and conduct that is fairly traceable to the defendant; and (3) it is likely, as opposed to merely specu-

lative, that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. at 560-61, 112 S.Ct. 2130. Because the elements of standing are "not mere pleading requirements, but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561, 112 S.Ct. 2130. The trial court may allow plaintiffs the opportunity to supply by affidavits further particularized allegations of fact in support of standing, but "[i]f, after this opportunity, plaintiffs' standing does not adequately appear from all materials of record, the complaint must be dismissed." *Warth v. Seldin*, 422 U.S. at 501-02, 95 S.Ct. 2197.

In this case, the complaint fails to allege any of the three elements required to establish standing. The complaint describes plaintiffs generally as membership organizations representing constituencies in the Pacific Northwest, *see* Amended Complaint at ¶¶ 9-12; it describes the IC-BEMP, and in five claims for relief, it alleges various constitutional and statutory violations. *Id.* at ¶¶ 31-61. The complaint is silent as to injury in fact, causation, and redressability. Instead, plaintiffs cite *Mountain States Legal Foundation v. Glickman* for the general proposition that "CGNW is an organization with standing to sue on issues related to forest management statutes." Amended Complaint at ¶ 9. Obviously, plaintiffs must do more than invoke an unrelated case in which a court found that one of them had standing to sue. *See Warth v. Seldin*, 422 U.S. at 499, 95 S.Ct. 2197 ("A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from

---

9. "The standing question thus bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention—and of moot-

ness—whether the occasion for judicial intervention persists." *Warth v. Seldin*, 422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

the putatively illegal action.'") (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). Thus, in support of their standing argument, plaintiffs have filed the declaration of Bruce Vincent, a logger from Libby, Montana, who lives in the Kootenai National Forest and is the founder and president of CGNW. In addition, plaintiffs have attached correspondence with other non-party organizations and various environmental assessments from unrelated land management projects to demonstrate that federal land managers have been using scientific data from the unfinished IC-BEMP in their decision-making.

### A. Standing of OCA, MFBF, and WCA

■ The OCA was an original party to the case along with CGNW. It is a non-profit organization with about 2,400 members, which purports to "advance the economic, political, and social interests of the Oregon cattle industry, and to promote scientifically sound management practices to maintain and enhance rangeland vegetation, wildlife habitat, riparian zones, and water quality." Amended Complaint at ¶ 10. The MFBF and the WCA joined in the amended complaint. The MFBF is a non-profit organization with more than 8,000 members, which purports to "analyze the problems facing farmers and ranchers in Montana and to formulate action to achieve educational improvement, economic opportunity, and social advancement and, thereby, to promote the national well-being." Amended Complaint at ¶ 11. The WCA is a non-profit organization with about 2,500 members, whose stated mission is to "build knowledge, develop and share solutions to problems facing the agricultural industry." Amended Complaint at ¶ 12. Plaintiffs have provided no affidavits (or any other documentation) to supplement the facially deficient standing claims of the OCA, MFBF, and WCA. Mr. Vincent's declaration does not even mention the OCA, MFBF and WCA. Accordingly, the motion to dismiss is granted

with respect to the OCA, MFBF and WCA. *See Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (holding that organizational plaintiffs seeking review of an agency action must allege specific harm to a member or members); *Warth v. Seldin*, 422 U.S. at 499–502, 95 S.Ct. 2197 (holding that plaintiff may not rest its claim to relief upon the legal rights or interests of third parties).

### B. Standing of CGNW

■ CGNW is a non-profit organization located in Libby, Montana that provides information on natural resource management to its members and to the public at large. Amended Complaint at ¶ 9. In *Mountain States Legal Foundation v. Glickman*, 922 F.Supp. 628, 629–30 (D.D.C.1995) CGNW sued the Department of Agriculture to block implementation of a U.S. Forest Service plan to limit timber harvesting in the Kootenai National Forest. The D.C. Circuit found that the marginal increase in the risk of forest fires caused by the plan posed a threat to their aesthetic and environmental interests significant enough to give CGNW constitutional standing. *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228 (D.C.Cir.1996). CGNW established standing in that case through affidavits from its constituent members, including one from Mr. Vincent, who attested that he lived in the middle of the affected area, that he used it for recreational purposes, such as hunting, fishing, and berrypicking, and that these particular interests would be harmed by the increased chance of wildfire attributable to the government's action. *See id.* at 1233. Another affiant asserted that he hiked and camped in the very area of the Kootenai affected by the logging decisions under review. In addition, data in the EIS showed that the challenged plan posed a higher risk of fires than CGNW's proposed plan. *See id.* at 1234.

A very different situation is presented here. Instead of being able to rely on *Mountain States* to bolster its claim of standing, that case highlights the glaring deficiencies in CGNW's current standing claim.

## 1. Injury in Fact

In support of CGNW's standing, the organization's president Bruce Vincent filed a declaration, as he did in *Mountain States*. However, unlike the declaration in *Mountain States*, this declaration does not allege any particularized harm to Mr. Vincent or CGNW's interests flowing from the ICBEMP. Rather, Mr. Vincent alleges that "although ICBEMP is still not final and the public has not been given the opportunity to comment on and object to a final, let alone preliminary, decision document regarding ICBEMP, including the assumptions, findings, and conclusions used to reach any ICBEMP decisions, those non-final assumptions, findings, and conclusions are being used by other federal land managers to make decisions that impact me personally, as well as the members of CGNW." Vincent Decl. at ¶ 10. Mr. Vincent claims, for instance, that the Kootenai National Forest planner in Libby, Montana, told him that Mike Dombeck, the Chief of the National Forest, "used information from ICBEMP in providing the factual and scientific basis for his far-reaching decision to issue a moratorium on management within roadless areas throughout the National Forest System." Vincent Decl. at ¶¶ 11–12. Mr. Vincent states, "This is a decision that adversely affects me as a user of the national forests of the Pacific Northwest and that adversely affects members of CGNW." *Id.* at ¶ 12. Mr. Vincent does not explain how or why a moratorium on management in roadless areas would adversely affect him or other members of CGNW. Mr. Vincent also states that he has debated the Forest Service's closure of roads in the Kootenai with the forest planner in Libby, although he does not indicate that these closures were the result of any scientific findings that emerged from the ICBEMP. *Id.* In addition, plaintiffs attached a number of excerpts from reports on specific districts in forests that are part of the geographic region under study in the ICBEMP.[10] For example, the Tonasket Ranger District in the Okanogan National Forest located in Washington was responsible for the *Salmon Watershed Assessment*. Each of the documents use data from the IC-BEMP as one of the many scientific sources considered. Plaintiffs' opposition asserts that their organizational members use federal lands for economic and recreational activities, such as livestock grazing, "hunting, fishing, camping, wood collecting, recreating, and other legal activities," and that these activities are adversely affected in some unspecified way by decisions made in the attached documents. Opposition at 4.

 The Court finds Mr. Vincent's affidavit and the supporting documentation insufficient to establish a "concrete and particularized" injury that is "actual or imminent," as is required for constitutional standing. *See Florida Audubon Society v. Bentsen*, 94 F.3d at 662–70. Standing requirements are especially stringent where reaching the merits of the dispute would force the court to decide whether an action taken by one of the other two branches of the federal government was unconstitutional. *See Chenoweth v. Clinton*, 997 F.Supp. 36, 38 (D.D.C.1998) (finding that plaintiff alleged merely a generalized grievance and not the particularized, personal injury required to establish standing). Likewise, plaintiffs' claims asserted

---

10. Attached are portions of the following documents: *Salmon Watershed Assessment; Parasol Vegetation and Watershed Management Project; Initial Planning and Budget Advice, FY 1999; South Tower Fire Recovery Projects; Meadow Environmental Impact Statement* *Record of Decision; Berton Ecosystem Management Projects Environmental Assessment; Wood Rat Environmental Assessment; Pine Environmental Assessment; Southeast Oregon Resource Management Plan/Environmental Impact Statement.*

under the APA or RFA must fail, since a procedural-rights plaintiff must demonstrate that the interest asserted is more than a mere "general interest common to all members of the public." *See Florida Audubon Society v. Bentsen*, 94 F.3d at 664. Rather plaintiff must show that the government act performed in the absence of the procedure in question will cause a distinct risk to a particularized interest of the plaintiff. *Id.* The mere allegation that the agency followed an improper process does not grant standing absent the assertion of a personal injury. *Id.*

CGNW points to no injury resulting from defendants' actions in undertaking or implementing the ICBEMP, because the plan has not yet been implemented. Nor do plaintiffs even claim palpable indirect injury by the alleged use of ICBEMP science by other federal land management programs.[11] The only allegation that even comes close to the requisite specificity is Mr. Vincent's claim that the Chief of the National Forest used information from the ICBEMP in deciding to issue a moratorium on management within roadless areas throughout the National Forest System. Perhaps the moratorium harms Mr. Vincent economically in his occupation as a logger, but the declaration does not say so, and the Court should not be forced to speculate. Nor does Mr. Vincent allege that any of his logging activities occur in the area affected by the moratorium. *See Sierra Club v. Morton*, 405 U.S. at 734, 92 S.Ct. 1361 (holding that because Sierra Club did not allege that any of its members used the area that was actually affected by the planned development, it had no standing.) As the Supreme Court observed in *Lujan v. National Wildlife Federation*, when it held insufficient respondent's averments that one of its members

used some unspecified portion of the immense tract of territory at issue, "It will not do to 'presume' the missing facts because without them the affidavits would not establish the injury that they generally allege." 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

### 2. Causation

Moreover, even had CGNW alleged a sufficient injury, which it has not, standing would fail for lack of causation and redressability. Plaintiffs alleging procedural violations of this nature must demonstrate that the particular injury is fairly traceable to the disputed agency action. *See Florida Audubon Society v. Bentsen*, 94 F.3d at 665. "[U]nless there is a substantial probability . . . that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff, the plaintiff lacks standing." *Id.* at 669. Here, plaintiffs have shown no causal connection between the alleged statutory violations in the ICBEMP process and the nebulous injuries that are supposed to have resulted from federal land management decisions based upon ICBEMP science. In fact, with the notable exception of the moratorium in roadless areas, plaintiffs do not even point to any actual decision-making based on ICBEMP science. Rather, plaintiffs merely assert that contested ICBEMP science is being cited and considered. The fact that scientific data emerging from the ICBEMP is considered as one of myriad other factors cannot satisfy the causation requirement.

### 3. Redressability

Finally, plaintiffs claims lack redressability. Even if the Court were to enjoin

---

**11.** Plaintiffs do not point to any injury resulting to their members from any of the studies alleged to rely on the ICBEMP: the *Salmon Watershed Assessment; Parasol Vegetation and Watershed Management Project; Initial Planning and Budget Advice, FY 1999; South Tower Fire Recovery Projects; Meadow Envi-* *ronmental Impact Statement Record of Decision; Berton Ecosystem Management Projects Environmental Assessment; Wood Rat Environmental Assessment; Pine Environmental Assessment;* or *Southeast Oregon Resource Management Plan/Environmental Impact Statement.*

completion of the EIS and grant all declaratory relief, it would not prevent other decision-makers from using the best available science or remedy the alleged harm caused by those decisions already made. Plaintiffs may not take a "programmatic" approach to lawsuits, whereby they attempt to invalidate all agency projects with which they disagree by launching an overarching attack on government action at a more general level. *See Lujan v. Defenders of Wildlife*, 504 U.S. at 567, 112 S.Ct. 2130 (holding that plaintiff's claims were not redressable.)

In short, having reviewed the complaint, the Vincent Declaration, and all other materials filed by the plaintiffs, the Court concludes that CGNW lacks standing to press any of its claims, since it has failed to satisfy its burden of demonstrating any of the three elements needed to establish constitutional standing.

## II. *Judicial Review: "Final Agency Action"*

■ The United States and its agencies are not amenable to suit, absent a statutory waiver of sovereign immunity. *See J.B. Floyd v. District of Columbia*, 129 F.3d 152, 155 (D.C.Cir.1997) ("Where the United States is the defendant, ... federal subject matter jurisdiction is not enough; there must also be a statutory cause of action through which Congress has waived sovereign immunity."). Plaintiffs' complaint asserts violations of a host of federal land management statutes—but not the APA—as the basis for this Court's jurisdiction. With the exception of the RFA, however, none of the statutes cited in the complaint confers a private right to judicial review for alleged violation of its provisions. In their Opposition plaintiffs suggest that, although they did not cite the APA in their complaint, they are relying on it nonetheless as a basis for judicial review.

■ The APA and the RFA only provide for judicial review of "final agency actions." *See* 5 U.S.C. § 704 and 5 U.S.C.

§ 611(a)(1). In order for an agency action to be considered final, it must satisfy two requirements: (1) The action must "mark the consummation of the agency's decision-making process" and must not be of a "merely tentative or interlocutory nature," and (2) the action must be one by which "rights or obligations. have been determined," or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). "It is thus well established that Draft EISs are not subject to judicial review." *Committee Against Railroad Relocation v. Adams*, 471 F.Supp. 142, 145 (E.D.Ark.1979). Until the U.S. Forest Service and Bureau of Land Management have "exercised their discretion in approving or not approving a project or performed some act that could affect the impact area, there is no basis on which to predicate judicial review." *Id.* (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411–18, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Camp v. Pitts*, 411 U.S. 138, 141–42, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); and *Toilet Goods Ass'n., Inc. v. Gardner*, 387 U.S. 158, 162–63, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967)).

Plaintiffs concede that the ICBEMP process is not final, but they insist that other federal officials are using the scientific "assumptions, findings, and conclusions" generated by the project "for making decisions regarding the management of other federal lands in the Pacific Northwest." Opposition at 3–4. Plaintiffs provide several examples of environmental impact statements or assessments, prepared in connection with other unrelated land management projects, which cite or consider data collected for the ICBEMP; and from these examples plaintiffs contend that the ICBEMP, although incomplete, is being implemented as a final agency action. The Court disagrees.

Even assuming that jurisdiction under the APA had been alleged in the complaint, the APA does not confer jurisdiction to review such a generalized griev-

ance. *See Lujan v. National Wildlife Federation,* 497 U.S. at 894, 110 S.Ct. 3177 ( "Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality, we intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect."). Here, plaintiffs have not challenged a specific final agency action that has caused or is expected to cause them imminent harm. Rather, plaintiffs have challenged two draft EISs that they admit were not finalized at the time they filed the complaint[12], and which have since undergone significant changes, including the exclusion of twelve million acres of land from the project's purview. The fact that federal decisionmakers in unrelated contexts have considered the scientific findings from the IC-BEMP does not translate into a "final agency action" for purposes of the APA. If plaintiffs have a basis to complain about the *South Tower Fire Recovery Project* or the *Wood Rat Environmental Assessment,* they must challenge the projects individually and not through the blunderbuss approach they have adopted here of attacking the ICBEMP. *See Lujan v. National Wildlife Federation,* 497 U.S. at 891, 110 S.Ct. 3177 ("[R]espondent cannot seek wholesale improvement of this program by court decree rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made."). Were the Court to adopt plaintiffs' expansive definition of "final agency action" and grant the type of sweeping relief they seek, it would certainly disrupt the ongoing planning and conservation efforts of federal land managers who depend on the use of the best science available for their decisions. *See Port of Boston Marine Terminal Ass'n v. Rederi-*

*aktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970) (holding that an agency action should have reached a stage where judicial review "will not disrupt the orderly process of adjudication and ... rights or obligations have been determined or legal consequences will flow from the agency action").

Thus, the Court holds that the case may be dismissed for the alternative reason that the ICBEMP is not a final agency action within the meaning of the APA or the RFA, and plaintiffs have provided no other statutory authority for the exercise of this Court's jurisdiction.

---

**12.** *See* Declaration of Bruce Vincent at ¶ 10. ("[A]lthough ICBEMP is still not final and the public has not been given the opportunity to comment on and object to a final, let alone preliminary, decision document regarding IC-BEMP, including the assumptions, findings, and conclusions used to reach ICBEMP decisions, those non-final assumptions are being used by other federal land managers to make decisions that impact me personally, as well as the members of CGNW.").